Justice KENNEDY, concurring.
The opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute. In my view that is a proper disposition. Many serious concerns with respect to human rights abuses committed abroad have been addressed by Congress in statutes such as the Torture Victim Protection Act of 1991 (TVPA), 106 Stat. 73, note following 28 U.S.C. § 1350, and that class of cases will be determined in the future according to the detailed statutory scheme Congress has enacted. Other cases may arise with allegations of serious violations of international law principles protecting persons, cases covered neither by the TVPA nor by the reasoning and holding of today's case; and in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation.
Justice ALITO, with whom Justice THOMAS joins, concurring.
I concur in the judgment and join the opinion of the Court as far as it goes. Specifically, I agree that when Alien Tort Statute (ATS) "claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." Ante, at 1669. This formulation obviously leaves *126 much unanswered, and perhaps there is wisdom in the Court's *1670 preference for this narrow approach. I write separately to set out the broader standard that leads me to the conclusion that this case falls within the scope of the presumption.
In Morrison v. National Australia Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), we explained that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." Id., at ----, 130 S.Ct., at 2884. We also reiterated that a cause of action falls outside the scope of the presumption-and thus is not barred by the presumption-only if the event or relationship that was "the 'focus' of congressional concern" under the relevant statute takes place within the United States. Ibid. (quoting EEOC v. Arabian American Oil Co., 499 U.S. 244, 255, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ). For example, because "the focus of the [Securities] Exchange Act [of 1934] is not upon the place where the deception originated, but upon purchases and sales of securities in the United States," we held in Morrison that § 10(b) of the Exchange Act applies "only" to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U.S., at ---- - ----, 130 S.Ct., at 2883-2885.
The Court's decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), makes clear that when the ATS was enacted, "congressional concern" was " 'focus[ed],' " Morrison, supra, at ----, 130 S.Ct., at 2883-2884, on the "three principal offenses against the law of nations" that had been identified by Blackstone: violation of safe conducts, infringement of the rights of ambassadors, and piracy, Sosa, 542 U.S., at 723-724, 124 S.Ct. 2739. The Court therefore held that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted." Id., at 732, 124 S.Ct. 2739. In other words, only conduct that satisfies Sosa 's requirements of definiteness and acceptance among civilized nations can be said to have been *127 "the 'focus' of congressional concern," Morrison,supra, at ----, 130 S.Ct., at 2884, when Congress enacted the ATS. As a result, a putative ATS cause of action will fall within the scope of the presumption against extraterritoriality-and will therefore be barred-unless the domestic conduct is sufficient to violate an international law norm that satisfies Sosa 's requirements of definiteness and acceptance among civilized nations.
Justice BREYER, with whom Justice GINSBURG, Justice SOTOMAYOR and Justice KAGAN join, concurring in the judgment.
I agree with the Court's conclusion but not with its reasoning. The Court sets forth four key propositions of law: First, the "presumption against extraterritoriality applies to claims under" the Alien Tort Statute. Ante, at 1669. Second, "nothing in the statute rebuts that presumption." Ibid. Third, there "is no clear indication of extraterritoria[l application] here," where "all the relevant conduct took place outside the United States" and "where the claims" do not "touch and concern the territory of the United States ... with sufficient force to displace the presumption." Ante, at 1669 (internal quotation marks omitted). Fourth, that is in part because "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices."Ante, at 1669.
*1671 Unlike the Court, I would not invoke the presumption against extraterritoriality. Rather, guided in part by principles and practices of foreign relations law, I would find jurisdiction under this statute where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind. See Sosa v. Alvarez-Machain, 542 U.S. 692, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)
*128 (" '[F]or purposes of civil liability, the torturer has become-like the pirate and slave trader before him-hostis humani generis, an enemy of all mankind.' " (quoting Filartiga v. Pena-Irala, 630 F.2d 876, 890 (C.A.2 1980) (alteration in original))). See also 1 Restatement (Third) of Foreign Relations Law of the United States §§ 402, 403, 404 (1986). In this case, however, the parties and relevant conduct lack sufficient ties to the United States for the ATS to provide jurisdiction.
I
A
Our decision in Sosa frames the question. In Sosa the Court specified that the Alien Tort Statute (ATS), when enacted in 1789, "was intended as jurisdictional." 542 U.S., at 714, 124 S.Ct. 2739. We added that the statute gives today's courts the power to apply certain "judge-made" damages law to victims of certain foreign affairs-related misconduct, including "three specific offenses" to which "Blackstone referred," namely "violation of safe conducts, infringement of the rights of ambassadors, and piracy." Id., at 715, 124 S.Ct. 2739. We held that the statute provides today's federal judges with the power to fashion "a cause of action" for a "modest number" of claims, "based on the present-day law of nations," and which "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features" of those three "18th-century paradigms." Id., at 724-725, 124 S.Ct. 2739.
We further said that, in doing so, a requirement of "exhaust[ion]" of "remedies" might apply. Id., at 733, n. 21, 124 S.Ct. 2739. We noted "a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." Ibid. Adjudicating any such claim must, in my view, also be consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its own laws *129 and their enforcement. Id., at 761, 124 S.Ct. 2739 (BREYER, J., concurring in part and concurring in judgment). See also F. Hoffmann-La Roche Ltd. v. Empagran S. A., 542 U.S. 155, 165-169, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004).
Recognizing that Congress enacted the ATS to permit recovery of damages from pirates and others who violated basic international law norms as understood in 1789, Sosa essentially leads today's judges to ask: Who are today's pirates? See 542 U.S., at 724-725, 124 S.Ct. 2739 (majority opinion). We provided a framework for answering that question by setting down principles drawn from international norms and designed to limit ATS claims to those that are similar in character and specificity to piracy. Id., at 725, 124 S.Ct. 2739.
In this case we must decide the extent to which this jurisdictional statute opens a federal court's doors to those harmed by activities belonging to the limited class that Sosa set forth when those activities take place abroad . To help answer this *1672 question here, I would refer both to Sosa and, as in Sosa, to norms of international law. See Part II, infra .
B
In my view the majority's effort to answer the question by referring to the "presumption against extraterritoriality" does not work well. That presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." Morrison v. National Australia Bank Ltd., 561 U.S. 247, ----, 130 S.Ct. 2869, 2877-2888, 177 L.Ed.2d 535 (2010). See ante, at 1664. The ATS, however, was enacted with "foreign matters" in mind. The statute's text refers explicitly to "alien[s]," "treat [ies]," and "the law of nations." 28 U.S.C. § 1350. The statute's purpose was to address "violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs." Sosa, 542 U.S., at 715, 124 S.Ct. 2739. And at least one of the three kinds of activities that we found to fall within the statute's scope, namely piracy, ibid. , normally takes place abroad.
*130 See 4 W. Blackstone, Commentaries on the Law of England 72 (1769).
The majority cannot wish this piracy example away by emphasizing that piracy takes place on the high seas. See ante, at 1667. That is because the robbery and murder that make up piracy do not normally take place in the water; they take place on a ship. And a ship is like land, in that it falls within the jurisdiction of the nation whose flag it flies. See McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20-21, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) ; 2 Restatement § 502, Comment d ("[F]lag state has jurisdiction to prescribe with respect to any activity aboard the ship"). Indeed, in the early 19th century Chief Justice Marshall described piracy as an "offenc[e] against the nation under whose flag the vessel sails, and within whose particular jurisdiction all on board the vessel are." United States v. Palmer, 3 Wheat. 610, 632, 4 L.Ed. 471 (1818). See United States v. Furlong, 5 Wheat. 184, 197, 5 L.Ed. 64 (1820) (a crime committed "within the jurisdiction" of a foreign state and a crime committed "in the vessel of another nation" are "the same thing").
The majority nonetheless tries to find a distinction between piracy at sea and similar cases on land. It writes, "Applying U.S. law to pirates ... does not typically impose the sovereign will of the United States onto conduct occurring within the territorial jurisdiction of another sovereign and therefore carries less direct foreign policy consequences." Ante, at 1667 (emphasis added). But, as I have just pointed out, "[a]pplying U.S. law to pirates" does typically involve applying our law to acts taking place within the jurisdiction of another sovereign. Nor can the majority's words "territorial jurisdiction" sensibly distinguish land from sea for purposes of isolating adverse foreign policy risks, as the Barbary Pirates, the War of 1812, the sinking of the Lusitania, and the Lockerbie bombing make all too clear.
The majority also writes, "Pirates were fair game wherever found, by any nation, because they generally did not *131 operate within any jurisdiction." Ibid. I very much agree that pirates were fair game " wherever found." Indeed, that is the point. That is why we asked, in Sosa , who are today's pirates? Certainly today's pirates include torturers and perpetrators of genocide. And today, like the pirates of old, they are " fair game" where they are found. Like those pirates, they are "common enemies of all mankind and all nations have an equal interest in their apprehension and punishment." 1 Restatement *1673 § 404 Reporters' Note 1, p. 256 (quoting In re Demjanjuk, 612 F.Supp. 544, 556 (N.D.Ohio 1985) (internal quotation marks omitted)). See Sosa, supra, at 732, 124 S.Ct. 2739. And just as a nation that harbored pirates provoked the concern of other nations in past centuries, see infra, at 1674, so harboring "common enemies of all mankind" provokes similar concerns today.
Thus the Court's reasoning, as applied to the narrow class of cases that Sosa described, fails to provide significant support for the use of any presumption against extraterritoriality; rather, it suggests the contrary. See also ante, at 1667 (conceding and citing cases showing that this Court has "generally treated the high seas the same as foreign soil for purposes of the presumption against extraterritorial application").
In any event, as the Court uses its "presumption against extraterritorial application," it offers only limited help in deciding the question presented, namely " 'under what circumstances the Alien Tort Statute ... allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States.' " 565 U.S. ----, 132 S.Ct. 472, 181 L.Ed.2d 292 (2012). The majority echoes in this jurisdictional context Sosa 's warning to use "caution" in shaping federal common-law causes of action. Ante, at 1664. But it also makes clear that a statutory claim might sometimes "touch and concern the territory of the United States ... with sufficient force to displace the presumption." Ante, at 1669. It leaves for another day the determination of *132 just when the presumption against extraterritoriality might be "overcome." Ante, at 1666.
II
In applying the ATS to acts "occurring within the territory of a[nother] sovereign," I would assume that Congress intended the statute's jurisdictional reach to match the statute's underlying substantive grasp. That grasp, defined by the statute's purposes set forth in Sosa, includes compensation for those injured by piracy and its modern-day equivalents, at least where allowing such compensation avoids "serious" negative international "consequences" for the United States. 542 U.S., at 715, 124 S.Ct. 2739. And just as we have looked to established international substantive norms to help determine the statute's substantive reach, id., at 729, 124 S.Ct. 2739, so we should look to international jurisdictional norms to help determine the statute's jurisdictional scope.
The Restatement (Third) of Foreign Relations Law is helpful. Section 402 recognizes that, subject to § 403's "reasonableness" requirement, a nation may apply its law (for example, federal common law, see 542 U.S., at 729-730, 124 S.Ct. 2739) not only (1) to "conduct" that "takes place [or to persons or things] within its territory" but also (2) to the "activities, interests, status, or relations of its nationals outside as well as within its territory," (3) to "conduct outside its territory that has or is intended to have substantial effect within its territory," and (4) to certain foreign "conduct outside its territory ... that is directed against the security of the state or against a limited class of other state interests." In addition, § 404 of the Restatement explains that a "state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade," and analogous behavior.
Considering these jurisdictional norms in light of both the ATS's basic purpose (to provide compensation for those injured by today's pirates) and Sosa 's basic caution *1674 (to avoid international friction), I believe that the statute provides jurisdiction *133 where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind.
I would interpret the statute as providing jurisdiction only where distinct American interests are at issue. Doing so reflects the fact that Congress adopted the present statute at a time when, as Justice Story put it, "No nation ha[d] ever yet pretended to be the custos morum of the whole world." United States v. La Jeune Eugenie, 26 F. Cas. 832, 847 (No. 15,551) (C.C.D.Mass.1822). That restriction also should help to minimize international friction. Further limiting principles such as exhaustion, forum non conveniens, and comity would do the same. So would a practice of courts giving weight to the views of the Executive Branch. See Sosa, 542 U.S., at 733, n. 21, 124 S.Ct. 2739; id., at 761, 124 S.Ct. 2739 (opinion of BREYER, J.).
As I have indicated, we should treat this Nation's interest in not becoming a safe harbor for violators of the most fundamental international norms as an important jurisdiction-related interest justifying application of the ATS in light of the statute's basic purposes-in particular that of compensating those who have suffered harm at the hands of, e.g., torturers or other modern pirates. Nothing in the statute or its history suggests that our courts should turn a blind eye to the plight of victims in that "handful of heinous actions." Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 781 (C.A.D.C.1984) (Edwards, J., concurring). See generally Leval, The Long Arm of International Law: Giving Victims of Human Rights Abuses Their Day in Court, 92 Foreign Affairs 16 (Mar. / Apr. 2013). To the contrary, the statute's language, history, and purposes suggest that the statute was to be a weapon in the "war" against those modern pirates *134 who, by their conduct, have " declar[ed] war against all mankind." 4 Blackstone 71.
International norms have long included a duty not to permit a nation to become a safe harbor for pirates (or their equivalent). See generally A. Bradford, Flying the Black Flag: A Brief History of Piracy 19 (2007) ("Every polis by the sea ... which was suspected of sponsoring piracy or harboring pirates could be attacked and destroyed by the Athenians"); F. Sanborn, Origins of the Early English Maritime and Commercial Law 313 (1930) ("In 1490 Henry VII made a proclamation against harboring pirates or purchasing goods from them"); N. Risjord, Representative Americans: The Colonists 146 (1981) ("William Markham, Penn's lieutenant governor in the 1690s, was accused of harboring pirates in Philadelphia.... Governor Benjamin Fletcher of New York became the target of a royal inquiry after he issued privateering commissions to a band of notorious pirates"); 3 C. Yonge, A Pictorial History of the World's Great Nations 954 (1882) ("[In the early 18th century, t]he government of Connecticut was accused of harboring pirates"); S. Menefee, Piracy, Terrorism, and the Insurgent Passenger: A Historical and Legal Perspective, in Maritime Terrorism and International Law 51 (N. Ronzitti ed. 1990) (quoting the judge who handled the seizure of the Chesapeake during the Civil War as stating that " 'piracy jure gentium was justiciable by the court of New Brunswick, wherever committed' "); D. Field, Outlines of an International Code 33, Art.
*1675 84 (2d ed. 1876) (citing the 1794 treaty between the United States and Great Britain ("Harboring pirates forbidden. No nation can receive pirates into its territory, or permit any person within the same to receive, protect, conceal or assist them in any manner; but must punish all persons guilty of such acts")).
More recently two lower American courts have, in effect, rested jurisdiction primarily upon that kind of concern. In Filartiga, 630 F.2d 876, an alien plaintiff brought a lawsuit *135 against an alien defendant for damages suffered through acts of torture that the defendant allegedly inflicted in a foreign nation, Paraguay. Neither plaintiff nor defendant was an American national and the actions underlying the lawsuit took place abroad. The defendant, however, "had ... resided in the United States for more than ninth months" before being sued, having overstayed his visitor's visa. Id., at 878-879. Jurisdiction was deemed proper because the defendant's alleged conduct violated a well-established international law norm, and the suit vindicated our Nation's interest in not providing a safe harbor, free of damages claims, for those defendants who commit such conduct.
In Marcos , the plaintiffs were nationals of the Philippines, the defendant was a Philippine national, and the alleged wrongful act, death by torture, took place abroad. In re Estate of Marcos, Human Rights Litigation, 25 F.3d 1467, 1469, 1475 (C.A.9 1994) ; In re Estate of Marcos Human Rights Litigation, 978 F.2d 493, 495-496, 500 (C.A.9 1992). A month before being sued, the defendant, "his family, ... and others loyal to [him] fled to Hawaii," where the ATS case was heard. Marcos, 25 F.3d, at 1469. As in Filartiga , the court found ATS jurisdiction.
And in Sosa we referred to both cases with approval, suggesting that the ATS allowed a claim for relief in such circumstances. 542 U.S., at 732, 124 S.Ct. 2739. See also Flomo v. Firestone Natural Rubber Co., 643 F.3d 1013, 1025 (C.A.7 2011) (Posner, J.) ("Sosa was a case of nonmaritime extraterritorial conduct yet no Justice suggested that therefore it couldn't be maintained"). Not surprisingly, both before and after Sosa, courts have consistently rejected the notion that the ATS is categorically barred from extraterritorial application. See, e.g., 643 F.3d, at 1025 ("[N]o court to our knowledge has ever held that it doesn't apply extraterritorially"); Sarei v. Rio Tinto, PLC, 671 F.3d 736, 747 (C.A.9 2011) (en banc) ("We therefore conclude that the ATS is not limited to conduct occurring within the United States"); Doe v. Exxon Mobil *136 Corp., 654 F.3d 11, 20 (C.A.D.C.2011) ( "[W]e hold that there is no extraterritoriality bar").
Application of the statute in the way I have suggested is consistent with international law and foreign practice. Nations have long been obliged not to provide safe harbors for their own nationals who commit such serious crimes abroad. See E. de Vattel, Law of Nations, Book II, p. 163 (§ 76) ("pretty generally observed" practice in "respect to great crimes, which are equally contrary to the laws and safety of all nations," that a sovereign should not "suffer his subjects to molest the subjects of other states, or to do them an injury," but should "compel the transgressor to make reparation for the damage or injury," or be "deliver[ed] ... up to the offended state, to be there brought to justice").
Many countries permit foreign plaintiffs to bring suits against their own nationals based on unlawful conduct that took place abroad. See, e.g., Brief for Government of the Kingdom of the Netherlands et al. as Amici Curiae 19-23 (hereinafter Netherlands Brief) (citing inter alia Guerrero v.
*1676 Monterrico Metals PLc [2009] EWHC (QB) 2475 (Eng.) (attacking conduct of U.K. companies in Peru); Lubbe and Others v. Cape PLc [2000] UKHL 41 (attacking conduct of U.K. companies in South Africa); Rb. Gravenhage [Court of the Hague], 30 December 2009, JOR 2010, 41 m.nt. Mr. RGJ de Haan (Oguro/Royal Dutch Shell PLC) (Neth.) (attacking conduct of Dutch respondent in Nigeria)). See also Brief for European Commission as Amicus Curiae 11 (It is "uncontroversial" that the "United States may ... exercise jurisdiction over ATS claims involving conduct committed by its own nationals within the territory of another sovereign, consistent with international law").
Other countries permit some form of lawsuit brought by a foreign national against a foreign national, based upon conduct taking place abroad and seeking damages. Certain countries, which find "universal" criminal "jurisdiction" to try perpetrators of particularly heinous crimes such as piracy *137 and genocide, see Restatement § 404, also permit private persons injured by that conduct to pursue "actions civiles, " seeking civil damages in the criminal proceeding. Thompson, Ramasastry, & Taylor, Translating Unocal : The Expanding Web of Liability for Business Entities Implicated in International Crimes, 40 Geo. Wash. Int'l L.Rev. 841, 886 (2009). See, e.g., Ely Ould Dah v. France, App. No. 13113/03 (Eur. Ct. H. R.; Mar 30, 2009), 48 Int'l Legal Materials 884; Metcalf, Reparations for Displaced Torture Victims, 19 Cardozo J. Int'l & Comp. L. 451, 468-470 (2011). Moreover, the United Kingdom and the Netherlands, while not authorizing such damages actions themselves, tell us that they would have no objection to the exercise of American jurisdiction in cases such as Filartiga and Marcos. Netherlands Brief 15-16, and n. 23.
At the same time Congress has ratified treaties obliging the United States to find and punish foreign perpetrators of serious crimes committed against foreign persons abroad. See Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, Dec. 28, 1973, 28 U.S.T. 1975, T.I.A.S. No. 8532 ; Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, 24 U.S.T. 565, T.I.A.S. No. 7570 ; Convention for the Suppression of Unlawful Seizure of Aircraft, Dec. 16, 1970, 22 U.S.T. 1641, T.I.A.S. No. 7192 ; Restatement § 404 Reporters' Note 1, at 257 ("These agreements include an obligation on the parties to punish or extradite offenders, even when the offense was not committed within their territory or by a national"). See also International Convention for the Protection of All Persons from Enforced Disappearance, Art. 9(2) (2006) (state parties must take measures to establish jurisdiction "when the alleged offender is present in any territory under its jurisdiction, unless it extradites or surrenders him or her"); http://www.unhcr.org/refworld/docid/47fdfaeb0.pdf (as visited Apr. 1, 2013, and available in Clerk of Court's case file); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, Dec. 10, 1984, 1465 U. N. T. S. 85, Arts. 5(2), 7(1) (similar); Geneva Convention (III) Relative to *138 the Treatment of Prisoners of War, Art. 129, Aug. 12, 1949, [1955] 6 U.S. T. 3316, T. I. A. S. No. 3364 (signatories must "search for persons alleged to have committed, or to have ordered to be committed, such grave breaches, and shall bring such persons, regardless of their nationality, before its own courts" or "hand such persons over for trial").
And Congress has sometimes authorized civil damages in such cases. See generally note following 28 U.S.C. § 1350 (Torture *1677 Victim Protection Act of 1991 (TVPA) (private damages action for torture or extrajudicial killing committed under authority of a foreign nation)); S.Rep. No. 102-249, p. 4 (1991) (ATS "should not be replaced" by TVPA); H.R.Rep. No. 102-367, pt. 1, p. 4 (TVPA intended to "enhance the remedy already available under" the ATS). But cf. Mohamad v. Palestinian Authority, 566 U.S. ----, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012) (TVPA allows suits against only natural persons).
Congress, while aware of the award of civil damages under the ATS-including cases such as Filartiga with foreign plaintiffs, defendants, and conduct-has not sought to limit the statute's jurisdictional or substantive reach. Rather, Congress has enacted other statutes, and not only criminal statutes, that allow the United States to prosecute (or allow victims to obtain damages from) foreign persons who injure foreign victims by committing abroad torture, genocide, and other heinous acts. See, e.g., 18 U.S.C. § 2340A(b)(2) (authorizing prosecution of torturers if "the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender"); § 1091(e)(2)(D) (2006 ed., Supp. V) (genocide prosecution authorized when, "regardless of where the offense is committed, the alleged offender is ... present in the United States"); note following 28 U.S.C. § 1350, § 2(a) (private right of action on behalf of individuals harmed by an act of torture or extrajudicial killing *139 committed "under actual or apparent authority, or color of law, of any foreign nation"). See also S.Rep. No. 102-249, supra, at 1671 - 1672 (purpose to "mak[e] sure that torturers and death squads will no longer have a safe haven in the United States," by "providing a civil cause of action in U.S. courts for torture committed abroad").
Thus, the jurisdictional approach that I would use is analogous to, and consistent with, the approaches of a number of other nations. It is consistent with the approaches set forth in the Restatement. Its insistence upon the presence of some distinct American interest, its reliance upon courts also invoking other related doctrines such as comity, exhaustion, and forum non conveniens, along with its dependence (for its workability) upon courts obtaining, and paying particular attention to, the views of the Executive Branch, all should obviate the majority's concern that our jurisdictional example would lead "other nations, also applying the law of nations," to "hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world." Ante, at 1669.
Most importantly, this jurisdictional view is consistent with the substantive view of the statute that we took in Sosa . This approach would avoid placing the statute's jurisdictional scope at odds with its substantive objectives, holding out "the word of promise" of compensation for victims of the torturer, while "break[ing] it to the hope."
III
Applying these jurisdictional principles to this case, however, I agree with the Court that jurisdiction does not lie. The defendants are two foreign corporations. Their shares, like those of many foreign corporations, are traded on the New York Stock Exchange. Their only presence in the United States consists of an office in New York City (actually owned by a separate but affiliated company) that helps to explain their business to potential investors. See Supp.
*140 Brief for Petitioners 4, n. 3 (citing Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 94 (C.A.2 2000) ); App. 55.
*1678 The plaintiffs are not United States nationals but nationals of other nations. The conduct at issue took place abroad. And the plaintiffs allege, not that the defendants directly engaged in acts of torture, genocide, or the equivalent, but that they helped others (who are not American nationals) to do so.
Under these circumstances, even if the New York office were a sufficient basis for asserting general jurisdiction, but see Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. ----, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011), it would be farfetched to believe, based solely upon the defendants' minimal and indirect American presence, that this legal action helps to vindicate a distinct American interest, such as in not providing a safe harbor for an "enemy of all mankind." Thus I agree with the Court that here it would "reach too far to say" that such "mere corporate presence suffices." Ante, at 1669.
I consequently join the Court's judgment but not its opinion.