McKEOWN, Circuit Judge,
concurring in part and dissenting in part, joined as to Part II by Judges REINHARDT and BERZON:
The Alien Tort Statute (“ATS”), albeit short on words, is a perplexing statute. Given the ink spilled in many judicial opinions, concurrences, and dissents, as well as scholarly articles, this brevity has not netted clarity.
Nonetheless, despite the many novel issues in this case, a few defining principles emerge.
Under the ATS, the federal courts have jurisdiction over claims for torts in violation of the law of nations. The law of nations is equally clear that genocide and war crimes are jus cogens violations of international law wherever they occur and whoever commits those crimes, whether an individual, group, corporation, or government. Importantly, one defining feature of the universal, specific, and obligatory norms prohibiting genocide and war crimes is the focus of those prohibitions on the identities of the victims of those crimes, as opposed to the identities of the perpetrators.
I concur in the majority’s holding that the ATS may give rise to tort actions based on extraterritorial conduct by corporations. I am flattered that the majority has adopted some of my language regarding these issues. However, I write separately because it is important to emphasize that the federal common law and the history of tort liability in domestic law provide essential support for both the extraterritorial reach of claims under “the law of nations” and corporate liability under those causes of action. Further, in my view, Sarei has not stated a claim for genocide or war crimes. I would remand to the district court to consider whether amendment is proper and therefore respectfully dissent from Parts IV(A)(3) and IV(B)(4) of the majority opinion.
I. Claims Under “The Law op Nations” Encompass Extraterritorial Conduct.
I agree with the result the majority reaches—that claims based on occurrences abroad may give rise to an ATS suit—but write separately to highlight the historical *781 predicate for this conclusion. As the D.C. Circuit recently explained, because the ATS is jurisdictional only, the underlying cause of action, not the statute, is given extraterritorial effect in suits in which the tort alleged occurred abroad. See Doe v. Exxon Mobil Corp., 654 F.3d 11, 23 (D.C.Cir.2011) (“The question here is not whether the ATS applies extraterritorially but instead whether the common law causes of action that federal courts recognize in ATS lawsuits may extend to harm to aliens occurring in foreign countries.”). The D.C. Circuit aptly noted that the ATS is a purely jurisdictional statute and is thus analogous to 28 U.S.C. § 1331—the statute creating federal question jurisdiction. Id. at 23-25. When suits are brought in federal court under federal question jurisdiction, we inquire not whether § 1331 applies extraterritorially but instead whether the cause of action applies extra-territorially. See Morrison v. Nat’l Australia Bank, Ltd., — U.S.—, 130 S.Ct. 2869, 2881-86, 177 L.Ed.2d 535 (2010) (examining whether the cause of action under § 10(b) of the Securities and Exchange Act and SEC Rule 10b-5 extends extraterritorially); see also Doe, 654 F.3d at 23-25 (noting that when an individual brings suit under the Torture Victim Protection Act of 1999 (TVPA), Pub.L. No. 102-256, 106 Stat. 73, the question is whether the TVPA’s cause of action extends extraterritorially and not whether the jurisdictional grant, § 1331, extends extraterritorially). I view the majority’s reference to extraterritorial application of the ATS as shorthand for whether the cause of action in an ATS suit encompasses conduct overseas. Although the ATS is jurisdictional, it cabins the source of the cause of action by reference to “the law of nations,” and for that reason I adopt the majority’s shorthand and refer to the extraterritorial application of the statute for the remainder of this opinion.
The majority appropriately concludes that the absence of specific language in the statute establishing extraterritorial effect is not a barrier to extraterritorial application of the ATS both because the statute has other indicia of extraterritorial applicability and because the statute itself does not provide the cause of action. See Maj. op. at 744-45. The Supreme Court underscored this principle in its most recent pronouncement on extraterritoriality. In Morrison, the Court held that a “clear indication of an extraterritorial application” may be found even in the absence of specific statutory language indicating Congress intended the statute to apply extra-territorially. 130 S.Ct. at 2883. The historical context of the ATS, according to the majority, provides abundant indication that the jurisdictional grant was intended to include claims alleging violations of the law of nations occurring outside of the United States. Maj. op. at 744-45. The history of the ATS, and particularly its ties to piracy, are “strong indications that Congress intended the Act to apply outside the United States.” Maj. op. at 747.
At the time of its enactment, the ATS was intended to encompass conduct both within and beyond the United States, including both crimes against foreign ambassadors in the United States and piracy. See Sosa v. Alvarez-Machain, 542 U.S. 692, 715-17, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (“It was this narrow set of violations of the law of nations [violation of safe conducts, infringement of the rights of ambassadors, and piracy], admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on minds of the men who drafted the ATS with its reference to tort.”). An opinion by Attorney General Bradford in 1795—a mere six years after adoption of the ATS—confirms this interpretation. Giving *782 the opinion its most logical reading, Bradford apparently concluded that the ATS may give rise to suits based on conduct occurring abroad—not only on the high seas, but even within the borders of other countries.[1] See Breach of Neutrality, 1 Op. Att’y Gen. 57, 58-59 (1795).
Because the ATS targeted violations of the law of nations at home and abroad and did so by providing the law of nations—an international body of law—as the source of the cause of action, both the international focus and the nature of the harm (violations of the law of nations generally and piracy specifically) signal congressional understanding that the ATS’s jurisdictional grant extends to torts committed outside of the United States.
Following Morrison, the Eleventh Circuit reiterated that extraterritoriality may derive from the international nature of the harm addressed by the statute, among other factors. See United States v. Belfast, 611 F.3d 783, 811 (11th Cir.2010) (“intentf ] [of extraterritorial applicability] of course may appear on the face of the statute, but it may also be ‘inferred from ... the nature of the harm the statute is designed to prevent,’ from the self-evident ‘international focus of the statute,’ and from the fact that ‘limiting] [the statute’s] prohibitions to acts occurring within the United States would undermine the statute’s effectiveness.’ ”) (quoting United States v. Plummer, 221 F.3d 1298, 1310 (11th Cir.2000)). This same principle applies to the ATS.
Further, “[c]ommon law courts of general jurisdiction regularly [have] adjudicate[d] transitory tort claims between individuals over whom they exercise personal jurisdiction, wherever the tort occurred.” Filartiga v. Pena-Irala, 630 F.2d 876, 885 (2d Cir.1980) (emphasis added). In holding that the ATS applies extraterritorially, the Second Circuit recited the history of American and British courts adjudicating extraterritorial tort claims. See id. (citing Lord Mansfield in Mostyn v. Fabrigas, 1 Cowp. 161 (1774); McKenna v. Fisk, 42 U.S. (1 How.) 241, 248, 11 L.Ed. 117 (1843); Dennick v. R.R. Co., 103 U.S. 11, 26, 26 L.Ed. 439 (1880); Slater v. Mexican Nat’l R.R. Co., 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904)). Similarly, the D.C. Circuit concluded that “[extraterritorial application of the ATS would reflect the contemporaneous understanding that, by the time of the Judiciary Act of 1789, a transitory tort action arising out of activities beyond the forum state’s territorial limits could be tried in the forum state.” Doe, 654 F.3d at 24-25. Indeed, “[i]t is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction.” Filartiga, 630 F.2d at 885.
Taken together, the language of the statute, the historical context, and the nature of the harm encompassed by “the law of nations,” supply the necessary “clear indication” that the ATS’s jurisdictional grant over torts in violation of the law of nations includes within its ambit at least some conduct occurring outside of the *783 United States. See Morrison, 130 S.Ct. at 2883.
II. The ATS May Give Rise to Corporate Liability.
I join the majority’s invocation of corporate liability under the ATS: “[t]he ATS contains no ... language and has no ... legislative history to suggest that corporate liability was excluded and that only liability of natural persons was intended.” Maj. op. at 748. At the turn of the Twentieth Century, no less than the Attorney General acknowledged that corporations could be liable under the ATS. See 26 Op. Atty. Gen. 250, 252-53 (1907) (opining that the ATS provided a mechanism through which to hold a U.S. corporation liable for violating provisions of the Convention Between the United States of America and the United States of Mexico Touching the International Boundary Line Where it Follows the Bed of the Rio Colorado (Nov. 2, 1884)). Thus, the view that ATS liability extends to a corporation that commits a tort in violation of the law of nations is one that has held sway for, at the very least, nearly half of the statute’s existence, and nothing before that time suggests a contrary position.
Jurists and scholars debate whether we look to international or domestic law to determine whether a corporation may be sued under the ATS. See Doe, 654 F.3d at 41 (“corporate liability differs fundamentally from the conduct-governing norms at issue in Sosa, and consequently customary international law does not provide the rule of decision”); id at 81-83 (Kavanaugh, J., dissenting in part) (looking to international law and concluding corporate liability may not lie under the ATS); Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 127-31 (2d Cir.2010) (concluding international law does not provide for corporate liability); id at 175 (Leval, J., concurring) (noting international law leaves the provision of civil remedies to the discretion of individual states); Mara Theophila, “Moral Monsters” Under the Bed: Holding Corporations Accountable for Violations of the Alien Tort Statute after Kiobel v. Royal Dutch Petroleum Co., 79 Fordham L. Rev. 2859 (2011) (summarizing the debate as to the law determining corporate liability under the ATS). The source of this split is Sosa’s holding that the ATS is jurisdictional only but that “federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.” 542 U.S. at 732, 124 S.Ct. 2739 (emphasis added).
An international norm is the sine qua non of an ATS suit, yet the tort cause of action is defined by customary international law as it has been incorporated into the federal common law. See Sosa, 542 U.S. at 724, 124 S.Ct. 2739 (“The [ATS] ... is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability....”). Because the common law, with its incorporation of international law, provides the cause of action, I would hold that courts should first look to the common law to see if the corporate defendant is within the ambit of the cause of action. Concluding that federal common law provides a long and consistent history of corporate liability in tort, I would then look to international law to insure the corporate defendant is included within the law of nations’ norm allegedly violated in a given suit. As to the amorphous line between a substantive offense under international law and other aspects of a cause of action under domestic law, I am cognizant that “Sosa at best lends Delphian guidance.” Khulumani v. *784 Barclay Nat’l Bank Ltd., 504 F.3d 254, 286 (2d Cir.2007) (Hall, J. concurring); see also Doe, 654 F.3d at 41-42 (same). Without the international norm, there can be no ATS cause of action, so the threshold challenge is defining the norm. Does the norm include the identification of the defendant or is that a function of the cause of action? I submit in the case of corporate liability that this distinction makes no difference. International law admits to corporate liability, as does domestic law.[2]
In an effort to follow the limited guidance provided in Sosa and make sense of the ATS’s jurisdictional grant, I would begin the domestic law analysis by returning to the basics of statutory interpretation. See Ransom v. FIA Card Services, — U.S. —, 131 S.Ct. 716, 723-24, 178 L.Ed.2d 603 (2011) (instructing courts to begin with the plain language of the statute). The language of the statute, as the Supreme Court has told us, “by its terms does not distinguish among classes of defendants[.]” Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 438, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The statute provides that the plaintiff must be an alien but it says nothing that would preclude corporate defendants. See 28 U.S.C. § 1350. Absent a subsequent or different statute or international law limiting the availability of a tort action against a certain defendant, the ATS allows an action in tort to lie against any defendant. See Amerada Hess, 488 U.S. at 438-39, 109 S.Ct. 683 (holding the Foreign Sovereign Immunities Act of 1976 barred ATS suits against foreign governments); Bowoto v. Chevron, 621 F.3d 1116, 1128 (9th Cir.2010) (holding the TVPA limits liability to natural persons).
Although we know very little about the First Congress’s intent in enacting the ATS, see Sosa, 542 U.S. at 718-19, 124 S.Ct. 2739, the mainstream understanding of tort liability in the time frame surrounding the statute’s enactment likely informed congressional action. See Lane v. Pena, 518 U.S. 187, 201, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (“[Cjongressional intent with respect to a statutory provision must be interpreted in the light of the contemporary legal context.”). The ATS is, after all, a grant of jurisdiction for actions in tort. 28 U.S.C. § 1350. In 1858, the Supreme Court reinforced the longstanding rule that “actions might be maintained against corporations for torts”:
[F]or acts done by the agents of a corporation, either in contractu or in delicto, in the course of its business, and of their employment, the corporation is responsible, as an individual is responsible under similar circumstances. At a very early period, it was decided in Great Britain, as well as in the United States, that actions might be maintained against corporations for torts; and instances may be found, in the judicial annals of both countries, suits for torts arising from the acts of their agents, of nearly every variety.
The Philadelphia, Wilmington, and Baltimore R.R. Co. v. Quigley, 62 U.S. 202, 210, 21 How. 202, 16 L.Ed. 73 (1858) (holding a corporation capable of “malice” and liable in tort for libel); see also Conard v. Pacific Ins. Co., 31 U.S. 262, 281-82, 6 Pet. 262, 8 L.Ed. 392 (1832) (holding a company liable for trespass); Lake Shore & M.S. Ry. Co. v. Prentice, 147 U.S. 101, 109, 13 S.Ct. 261, 37 L.Ed. 97 (1893) (“A corporation is doubtless liable, like an individual, *785 to make compensation for any tort committed by an agent in the course of his employment. ...”).
The long and consistent tradition of corporate liability in tort under the federal common law leaves no doubt that corporate liability is available under the ATS. See Cook Cnty. of Illinois v. Chandler, 538 U.S. 119, 125, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (recounting the history of corporate personhood and the understanding at the turn of the Nineteenth Century that corporations could sue and be sued); see also Doe, 654 F.3d at 47 (stating that “[corporate immunity ... would be inconsistent with the ATS because by 1789 corporate liability in tort was an accepted principle of tort law in the United States” and recounting the early history of corporate liability in tort under the common law). That a tort claim may be available against a corporation is, in fact, an unremarkable result. See Chandler, 538 U.S. at 125-27, 123 S.Ct. 1239 (discussing the history of corporate personhood and liability and its continued vitality in the absence of statutory restrictions). Instead, it would be remarkable if corporations were exempt from liability under the ATS.
Over the two hundred plus years of the statute’s existence, Congress has not amended the statute to preclude corporate liability or otherwise abrogate federal courts’ holdings in ATS cases. Rather, “Congress ... has not only expressed no disagreement with [federal courts’ holdings allowing ATS suits for violations of customary international law] ..., but has responded ... by enacting legislation [the TVPA] supplementing the judicial determination in some detail.” Sosa, 542 U.S. at 731, 124 S.Ct. 2739. Just as the Court found it significant that Congress did not amend or supplant the ATS when it enacted the TVPA, I find it significant that Congress did not amend the ATS to preclude corporate liability when it adopted the TVPA’s clear restriction to natural person defendants. See 28 U.S.C. § 1350, note § 2(a) (“An individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture, shall, in a civil action, be liable for damages....”) (emphasis added); see also Bowoto, 621 F.3d at 1128. In sum, there is no reason to believe that Congress intended anything but for the ATS to grant jurisdiction over claims against corporations for violations of the law of nations.
The availability of a tort action against a corporation under domestic law does not end the story. Because a claim under the ATS may lie only if the norm allegedly violated includes the named defendant within its ambit, we also must look to international law. See Sosa, 542 U.S. at 724, 124 S.Ct. 2739. Here, my inquiry is the same as the majority’s—that is, I would ask whether the international norm at issue excludes private corporate actors from its scope. See Maj. op. at 747-48. The starting point of this inquiry is whether private or non-state actors fall within the international norms. Although the extent to which non-state actors are bound to abide by international law has varied over the centuries, in modern times many norms of international law include private actors within their ambit. See Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 794 (D.C.Cir.1984) (Edwards, J., concurring) (discussing shifts in scholarly and judicial understandings of private parties’ responsibilities under international law from the Eighteenth Century through the late Twentieth Century).
Next it is important to recognize that the handful of international law violations that may give rise to an ATS claim are often restricted by the identity of the perpetrator, the identity of the victim, or *786 the locus of events. Such restrictions are part and parcel of the norm and as a result could limit the availability of a cause of action under the ATS. For example, the international norm most frequently associated with the ATS—the prohibition on piracy—is limited in modern times by both the perpetrator’s identity (a member of a private ship or private aircraft) and the locus of events (the high seas). See 18 U.S.C. § 1651; see also United Nations Convention on the Law of the Sea (UNC-LOS), art. 101, opened for signature Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994).[3] In contrast, the prohibition on torture contains no restriction as to the locus of events but generally requires state action or state acquiescence—the scope of the prohibition is restricted to certain perpetrators. See 18 U.S.C. § 2340(1) (“‘[T]orture’ means an act committed by a person acting under the color of law____”).[4]
The two international prohibitions at issue in this case, as the majority details, are restricted in scope primarily by the identities of the victims. See Maj. op. at 758-59, 764-65. Genocide is defined almost entirely based upon the identity of the victim—with no restrictions as to the identity of the perpetrator. See Bosnia and Herzegovina v. Serbia, 2007 I.C.J. 91, ¶ 167 (Feb. 26) (emphasizing the universal prohibition of genocide and its status as a binding norm upon both state and non-state actors). War crimes in violation of Common Article III are defined with reference to both the perpetrator (a party to the conflict, which necessarily includes both state and non-state actors in a non-international armed conflict) and the victim (a civilian). See Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 3, Oct. 21, 1950, 75 U.N.T.S. 287.
The particularity of each norm highlights the importance of conducting a norm-specific inquiry as to each alleged violation of international law to determine whether there is jurisdiction under the ATS. See Maj. op. at 748. The only remaining claims here are for genocide and war crimes—norms of international law that do not limit their scope by the corporate or private identity of the perpetrator. Consequently, there is no justification for exempting Rio Tinto from the reach of the ATS in this case.
In determining whether a norm of customary international law excludes corporate actors, I reject the notion that we must find an example of corporate liability in an international forum to satisfy Sosa. See Flomo, 643 F.3d 1013 (7th Cir.2011), 1019 (noting that “one of the principal criticisms” of corporate criminal liability relies on the availability of civil remedies against a corporation in the event of “abhorrent” corporate conduct); cf. Kiobel, 621 F.3d at 132-37 (relying heavily on the lack of international criminal liability to support the holding that corporate liability may not lie under the ATS). Instead, the *787 sole inquiry under international law is whether the norm allegedly violated extends to a private corporate actor. The Second Circuit’s analysis of liability of non-state actors under international law in Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995), is illustrative here. In Kadic, the defendant argued that “acts committed by non-state actors do not violate the law of nations.” Id. at 239 (internal quotation marks omitted). The Second Circuit rejected that argument, , looking to piracy as “[a]n early example of the application of the law of nations to the acts of private individuals.” Id. The court then proceeded to assess whether the international norms at issue in Kadic extended to private actors, concluding that the prohibitions of genocide and war crimes apply to state and non-state actors alike. Id. at 241-44. This approach is consistent with Sosa. See 542 U.S. at 733, n. 20, 124 S.Ct. 2739; see also Doe, 654 F.3d at 48-50 (noting some international treaties distinguish between natural and juridical persons whereas others do not).
Kadic was decided in 1995, before any individual had been held responsible for genocide in an international forum. See Prosecutor v. Akayesu, Trial Chamber Judgment, ICTR-96-4-T (Sept. 2, 1998) (first case holding an individual liable for genocide at an international tribunal). Nonetheless, the court in Kadic had no trouble concluding that private actors may commit genocide under international law and, as a result, be held liable under the ATS for their transgressions. 70 F.3d at 241-42. The Second Circuit looked to the sources of the international prohibition on genocide, as does the majority, to identify whether non-state actors fall within the ambit of the prohibition. See id. The proper inquiry is not whether a corporation has been held liable under international law, it is whether a corporation is bound to abide by the international norm at issue. See Sosa, 542 U.S. at 733 n. 20, 124 S.Ct. 2739 (noting courts must consider “whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued”); see also Flomo, 643 F.3d at 1017 (“There is always a first time for litigation to enforce a norm; there has to be.”).
Although the ATS grants jurisdiction over actions in tort, criminal cases are instructive to the extent they articulate customary international law—but criminal cases are not a limitation on tort liability. See Sosa, 542 U.S. at 734-38, 124 S.Ct. 2739 (concluding the international norm prohibiting arbitrary detention is insufficiently universal, specific, and obligatory to give rise to an ATS suit without reference to international criminal trials or the absence thereof); see also id., 542 U.S. at 762-63, 124 S.Ct. 2739 (Breyer, J. concurring) (noting “consensus as to universal criminal jurisdiction itself suggests that universal tort jurisdiction would be no more threatening” and that “universal criminal jurisdiction necessarily contemplates a significant degree of civil tort recovery as well”). In sum, the jurisprudence of international criminal tribunals is informative as to the content of the norm but the absence of relevant criminal jurisprudence is not particularly instructive in identifying proper defendants in a civil suit. See Flomo, 643 F.3d at 1019-20 (discussing the shortcomings of relying on international criminal law in determining rules of civil liability).
Of note, the majority explains that international law has not consistently precluded corporate criminal liability—at Nuremberg the prosecution apparently believed corporations could be criminally liable for violations of the law of nations but chose instead to focus on natural person defendants as a matter of strategy. See Maj. op. at 760-61; see also Jona *788 than A. Bush, The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said, 109 Colum. L. Rev. 1094, 1104-1130 (2009).[5] Notably, one judgment at Nuremberg was explicit that corporations can violate international law, concluding that “[wjhere private individuals, including juristic persons, proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action, not being expressly justified ..., is in violation of international law....” Kiobel, 621 F.3d at 180 (Leval, J., concurring) (quoting VIII Trials of War Criminals Before the Nuremberg Military Tribunals (1952)). The majority also correctly notes that various Nazi organizations were designated “criminal” by the Nuremberg Military Tribunal. Maj. op. at 760-61.
International criminal trials are but one means of remedying violations of international law—they are not the only means of enforcement nor the only source of customary international law. The judgments of international criminal tribunals provide useful insight as to the scope of customary international law’s prohibitions of certain conduct—such as genocide and war crimes. See Doe, 654 F.3d at 32 n. 17 (“Crimes and torts frequently overlap. In particular, most crimes that cause definite losses to ascertainable victims are also torts ... [In] a much earlier era of Anglo-American law, ... criminal and tort proceedings were not distinguished.” (internal quotation marks and citations omitted)). However, because the judgments of international criminal tribunals are rendered in criminal rather than civil trials, they must be used with caution in the ATS context and should not be invoked as a limiting factor regarding the capacity of defendants.
Finally, it bears noting that the incorporation of customary international law into domestic tort suits is not unique to the ATS. Federal courts acting in admiralty jurisdiction have long imposed corporate liability for torts under general maritime law, thus recognizing that federal common law often incorporates norms of international law. See The Amiable Nancy, 16 U.S. 546, 558, 3 Wheat. 546, 4 L.Ed. 456 (1818) (holding, without further delineation, “owners of [a] privateer” liable for tort); The “Scotland”, 105 U.S. 24, 27-30, 26 L.Ed. 1001 (1881) (holding corporate owner of a private ship liable but noting U.S. statute regarding shipowner liability narrowed general maritime law’s rules of liability in 1851). General maritime law is analogous to modern customary international law in that its core is a small body of international common law that is obligatory on all states and that has been incorporated into federal common law. See Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 206, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996) (referring to general maritime law as “a species of judge-made federal common law”); see also David J. Bederman, Law of the Land, Law of the Sea: The Lost Link Between Customary International Law and the General Maritime Law, 51 Va. J. Int’l L. 299, 303-22 (2011) (describing connection between customary international law and general maritime law, particularly “[i]n the early legal history of the United States”). This history of corporate liability under general maritime *789 law provides further support for the holding that corporate liability may lie under the ATS for at least some violations of customary international law.
The language of the ATS, the federal common law of tort liability at the time the statute was enacted, and the scope of the international prohibitions of genocide and war crimes, all point to the conclusion that a corporation may be subject to liability under the international norms prohibiting genocide and war crimes.
III. Sarei has not Sufficiently Stated Claims for Genocide and War Crimes.
I agree with the majority’s analysis of the international law prohibitions on genocide and war crimes, but I cannot join its conclusion that the claims survive dismissal. I would remand to the district court with instructions to dismiss these two claims but to consider whether leave to amend should be granted.
The logic supporting the requirement that an international norm must be “definable” or specific to give rise to an ATS claim is that federal courts must have standards to draw upon in adjudicating such claims. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739, citing favorably In re Estate of Marcos Human Rights Litigation, 25 F.3d 1467, 1475 (9th Cir.1994). When a claim relies on a specific and obligatory international norm, and the traditional sources of international law provide us with a clear definition of prohibited conduct, we are obligated to adhere to that definition in measuring the allegations set forth in the complaint. As to whether a claim meets pleading requirements, we look to domestic law, or in this case more specifically to the Supreme Court’s delineation of pleading standards in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).
A. Genocide
The complaint includes allegations of killing and serious bodily harm that are sufficient to infer the existence of genocidal acts—what it lacks are allegations that plaintiffs belong to a protected group. The essential components of a genocide claim are: (1) genocidal acts, such as murder; (2) targeting a protected group; (3) with intent to destroy that protected group in whole or in part. See Convention on the Prevention and Punishment of the Crime of Genocide (“Genocide Convention”), art. II, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277; see also Maj. op. at 758-59.
Authoritative sources have interpreted the definition of a protected group narrowly. The majority notes that the ICJ has held that a “protected group” under the Genocide Convention “must have particular positive characteristics—national, ethnic[ ], racial or religious—and not the lack of them.” Maj. Op. at 762; see Bosnia and Herzegovina v. Serbia, 2007 I.C.J. 91, ¶¶ 193-196 (Feb. 26). Thus “Bosnian Muslims” constitute a protected group under the Convention but a group defined in the negative (“non-Serbs”) does not constitute a protected group. Id. (“[T]he crime requires an intent to destroy a collection of people who have a particular group identity. It is a matter of who those people are, not who they are not.”). Similarly, one Trial Chamber Judgment at the International Criminal Tribunal for the Former Yugoslavia found that “the Genocide Convention does not protect all types of human groups. Its application is confined to national, ethnic[ ], racial or religious groups.” Prosecutor v. Krstic, Case No. IT-98-33T, Judgment, ¶¶ 554-59 (Aug. 2, 2001) (rejecting the Prosecution’s attempt to define the protected group as “Bosnian Muslims of Srebrenica” or “Bosnian Muslims of *790 Eastern Bosnia,” and holding geographical limitations are relevant to whether a significant part of the group was targeted but may not be used to define the protected group).[6]
The majority acknowledges this narrow definition of a protected group under international law, but then goes on to hold that “residents of Bougainville constitute a protected group.” Maj. op. at 762. Here, I must part ways with the majority. This protected group suffers from precisely the shortcoming the ICTY identified with the prosecution’s effort to define the Bosnian Muslims of Eastern Bosnia as “the protected group”—the group is defined not by nationality or ethnicity but instead by geography. See Krstic, Case No. IT-98-33T, at ¶¶ 554-59.
Here, the complaint defines individual plaintiffs as “resident[s] of Bougainville” and not as belonging to any specific national, ethnic, racial, or religious group. In its description of the “war crimes class,” plaintiffs’ complaint includes “victims and survivors of the Bougainville conflict.” The paragraph alleging genocide under Count I refers in passing to “natives.” The complaint refers repeatedly to “Bougainvilleans.” In addition, the complaint describes land ownership on a “clan” basis—leaving unstated whether “Bougainvilleans” is an umbrella term including multiple protected groups or a single racial or ethnic group. This ambiguity in the complaint renders the allegations insufficient. In fact, the allegations closely resemble arguments rejected by the ICJ and the ICTY to define a protected group for purposes of genocide based upon what a group is not or the geographic range in which individuals were targeted. The majority is content to conclude the complaint establishes “ethnic and racial traits sufficient to make Bougainvilleans a protected group,” but in my view the complaint’s failure to specify a protected group to which “Bougainvilleans” belong is a deficiency that warrants dismissing the claim—defining the protected group is the essential first step to making an allegation that defendants acted with the specific intent to destroy that group. See Genocide Convention, art. II; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 n. 3, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (plaintiffs must in the complaint “provid[e] not only fair notice of the nature of the claim, but also grounds on which the claim rests” (internal quotation marks and citation omitted)).
B. War Crimes
Rio Tinto’s purported role in the commission of war crimes is difficult to ascertain from the complaint. The complaint is a jumble of facts and conclusory statements that do not allege a coherent theory of Rio Tinto’s involvement in the alleged war crimes. The complaint fails to tell the basic story of who, what, where and when with respect to the war crimes claims, and Rio Tinto’s role is amorphous at best.[7] The majority fails to take heed of the Supreme Court’s recent reminder that “formulaic recitations of the elements” of a claim and “naked assertions devoid of further factual enhancement” are insufficient to survive a motion to dismiss. Iqbal, 129 *791 S.Ct. at 1949, 1951 (internal quotation marks and alterations omitted).
The majority holds that the international norm prohibiting war crimes includes within its proscription aiding and abetting the commission of war crimes,[8] just as the international norm includes corporations within its ambit. Maj. op. at 761-62. To the extent the international norm requires purposive action in furtherance of a war crime to establish aiding and abetting liability, the complaint fails to allege the necessary purpose to survive the motion to dismiss.[9] I would therefore reverse and remand to the district court for consideration of whether leave to amend is proper.
The complaint adequately alleges that war crimes were committed in Bougainville, ostensibly by the PNG government. However, the very language of the complaint underscores its frailties. Rio Tin-to’s role in the war crimes and the timing of those crimes (particularly as related to Rio Tinto’s alleged actions supplying equipment to the PNG forces) remains untethered to purposive action. At best the complaint alleges facts giving rise to an inference that Rio Tinto had knowledge of war crimes committed by PNG forces, but *792 missing is the purposive action the majority holds is required to establish aiding and abetting liability. See Maj. op. at 766-67; see also Talisman, 582 F.3d at 259. As a result, I dissent from the majority’s holding that the complaint establishes the requisite plausibility to survive the motion to dismiss. See Iqbal, 129 S.Ct. at 1949 (“Where a complaint pleads facts that are merely consistent with a defendant’s liability, it stops short of the line between possibility and plausibility of entitlement to relief.” (internal quotation marks and citation omitted)); see also Twombly, 550 U.S. at 570, 127 S.Ct. 1955.
A few examples are illustrative of the difficulties with the complaint. The allegations support an inference of mere knowledge on Rio Tinto’s part that Bougainville residents might be injured or killed as a result of military action taken by PNG in the context of an ongoing conflict and related to the reopening of Rio Tinto’s mining operations on Bougainville. Such an allegation is not surprising, nor particularly illuminating, in light of the ongoing conflict between the PNG and the militants, who were also residents of the island. Missing is the link between Rio Tinto and the PNG’s alleged war crimes—the murder of civilians. Intent to harm, particularly in the context of an ongoing conflict, is not equivalent to intent to further murder in violation of the Geneva Conventions. See Iqbal, 129 S.Ct. at 1948 (in the context of discrimination, purposeful action “requires more than intent as volition or intent as awareness of consequences.” (internal quotation marks and citation omitted)).
Another shortcoming relates to the allegations of “assistance” to the PNG. “[A]ssistance to the abuses of a government [which] was merely incidental to a proper business purpose” does not give rise to ATS liability for aiding and abetting a violation of the law of nations. Kiobel v. Royal Dutch Petroleum Co., 642 F.3d 268, 275-76 (2d Cir.2011) (order denying petition for rehearing en banc) (Leval, J., dissenting from denial of rehearing en banc). In my view, this case is akin to the unsuccessful ATS suit outlined in Talisman. See 582 F.3d at 262. There, the Second Circuit held that Talisman did not aid and abet war crimes even if it provided substantial assistance in the form of upgraded airstrips or roads for military use, because there was no evidence that Talisman intended to “aid atrocities” and particularly because the company apparently had a “legitimate need to rely on the military for defense.” Id. The situation here, at least as currently pled in the complaint, is not dissimilar. It is not alleged that Rio Tinto intended for the war crime of murder to be committed. See Prosecutor v. Tadic, Case No. IT-94-1-A, Judgment (July 15, 1999), ¶ 229(iv) (distinguishing between the knowledge mens rea which requires only “knowledge that the acts performed by the aider and abettor assist the commission of a specific crime by the principal,” from the mens rea of purpose, which requires “intent to perpetrate the crime”); see also Twombly, 550 U.S. at 556, 127 S.Ct. 1955 (“parallel conduct” is insufficient to establish unlawful agreement in the context of conspiracy).
The pleading inadequacies are not inconsequential as they go to the heart of the international norm violations. I therefore respectfully dissent from Part IV(B)(4) of the majority opinion.
IV. Conclusion
This appeal once again takes us into uncharted ATS waters. The alleged actions include horrific human rights violations, and I do not hesitate to apply thejus cogens norms prohibiting genocide and war crimes to corporations given the truly universal nature of those prohibitions. *793 Here, however, the nature of those human rights violations and Rio Tinto’s role in them are insufficiently articulated under the pleading standards required by the Supreme Court. I would remand, with instructions for the district court to dismiss the genocide and war crimes claims and consider whether leave to amend is appropriate.

. Like the majority in Doe v. Exxon, I read the Attorney General’s opinion to conclude that the criminal jurisdiction of the federal courts was limited in the case of piracy to acts committed on the high seas but that the civil jurisdiction was not so limited, and that the courts could provide a forum for a tort suit arising from incidents within the territorial bounds of Sierra Leone. 654 F.3d at 23-25. The Supreme Court's reference in Sosa supports this interpretation. See Sosa, 542 U.S. at 721, 124 S.Ct. 2739 (summarizing the inquiry submitted to Bradford as "whether criminal prosecution was available against Americans who had taken part in the French plunder of a British slave colony in Sieira Leone," and concluding Bradford advised that "a federal court was open for the prosecution of a tort action growing out of the episode.” (emphasis added)).

. The same challenge is inherent in determining standards for aiding and abetting liability. Like corporate liability, aiding and abetting liability is supported in both international and domestic law. I discuss aiding and abetting liability in detail in Section III(B) in connection with Sarei’s war crimes claim.

. The United States has signed but not ratified UNCLOS. However, the convention’s core provisions are generally accepted as customary international law. United States v. Alaska, 503 U.S. 569, 588, n. 10, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992) ("[T]he United States has not ratified [the United Nations Convention on the Law of the Sea], but has recognized that its baseline provisions reflect customary international law[.]” (internal quotation marks and citation omitted)).

. The complaint alleges that Rio Tinto acted in concert with a state actor, rendering its conduct “under color of state law.” Because genocide and war crimes do not require state action, it is unnecessary to consider whether a corporation may be liable for acting under “color of state law” in violating norms that do require state action.

. The Rome Statute for the International Criminal Court restricts the tribunal’s jurisdiction to natural persons. Art. 25(1), July 17, 1998, 2187 U.N.T.S. 3. The Rome Statute is, however, just one source of international law, and it speaks only to criminal, not civil, liability. See id.., art. 10 (noting the Rome Statute does not necessarily codify existing customary international law).

. The Trial Chamber’s Judgment defining the protected group was unchanged by the Appeals Chamber Judgment. Prosecutor v. Krstic, Case No. IT-98-33-A, Appeals Chamber Judgment, ¶ 15 (Apr. 19, 2004).

. It is also unclear where the crimes against humanity claim ends and where the war crimes claim begins. See Maj. op. at 766 (relying on allegations supporting the crimes against humanity claim to conclude the complaint adequately alleges war crimes).

. It bears noting that aiding and abetting, like corporate liability, raises the question whether the mode of liability is part and parcel of the conduct regulated by the international norm or more akin to a cause of action that should be analyzed under federal common law. Compare Doe, 654 F.3d at 40-42 (distinguishing between “conduct-governing norms” and "the technical accoutrements to a cause of action” (internal quotation marks and citation omitted)) and Khulumani, 504 F.3d at 264-77 (Katzmann, J. concurring) (looking to international law to define aiding and abetting liability) with id. at 285-91 (Hall, J., concurring) (looking to federal common law to define accessorial liability). I believe much of this debate boils down to the difficulty in deciphering where the conduct-regulating international norms end and the remedy-specific standards of domestic law begin. Aiding and abetting is not necessarily tied up in the international norm; it arguably fits comfortably within the framework of a cause of action—the legal theory of relicf. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173-78, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (discussing the scope of the "private ... cause of action” under Rule 10b-5 and concluding that it does not include an "aiding and abetting cause of action”). I do not resolve this conundrum here because even under the knowledge standard dictated by domestic law, Sarei's complaint is deficient. Under domestic law, aiding and abetting requires more than knowledge of relevant facts alone; it also requires an affirmative act of aiding, counseling, commanding, inducing or procuring another to commit each element of the crime, in this case murder in violation of the law of nations. See, e.g., Ninth Circuit Model Criminal Jury Instructions 5.1 (2010) ("Aiding and Abetting”), available at http;// 207.41.19.15/web/sdocuments.nsficrim.

. I am cognizant that most international tribunals have employed a knowledge mens rea in assigning aiding and abetting liability for war crimes. See Tadic, IT-94-1-A at ¶ 229(iv); see also James Morrissey, Presbyterian Church of Sudan v. Talisman Energy, Inc.: Aiding and Abetting Liability Under the Alien Tort Statute, 20 Minn. J. Int'l L. 144, 158-67 (2011). However, I agree with the majority and with the Second Circuit that the Rome Statute’s imposition of the narrower and more exacting standard of purpose reflects a lack of uniformity as to the imposition of aiding and abetting liability based on knowledge alone. See Maj. op. at 766; see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 259 (2d Cir.2009). There is no dispute that aiding and abetting the violation of the law of nations is prohibited under international law. But there is no uniform agreement on the full scope of what conduct qualifies as aiding and abetting; at a minimum, however, there is universal agreement that purposive conduct to aid and abet the commission of a war crime violates the law of nations. The minimum core of conduct universally and specifically prohibited by international law includes purposively aiding and abetting the commission of a war crime, and such action therefore gives rise to an ATS suit under Sosa. See 542 U.S. at 732, 124 S.Ct. 2739.